**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TAVARES HUNT, <br> LEE MCCORKER, <br> BRUCE GILES, <br> JOSE H. ROMERO, and <br> GEORGE CORTEZ, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS DART, in his Official Capacity as Sheriff of Cook County, COUNTY OF COOK, ILLINOIS, a local public entity under the laws of the State of Illinois, MICHAEL MILLER, Superintendant of Division 10 at Cook County Jail, AVERY HART, Medical Director of Cook County Jail, and J. LANG, <br><br> Defendants. | Civil Action No. 09-C-2071 <br><br> Judge Matthew F. Kennelly |

**FOURTH AMENDED COMPLAINT**

Plaintiffs, TAVARES HUNT ("Mr. Hunt"), LEE MCCORKER ("Mr. McCorker"), BRUCE GILES ("Mr. Giles"), JOSE H. ROMERO ("Mr. Romero"), and GEORGE CORTEZ ("Mr. Cortez") by and through their attorney, LATHAM & WATKINS LLP, for their Fourth Amended Complaint ("Complaint") hereby state as follows:

**NATURE OF THE ACTION**

1. This is a civil action brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, based on violations of the Fourteenth Amendment to the Constitution of the United States. This action arises from the suffering Plaintiffs endured as a result of Defendants' deliberate indifference to their health and safety.

1

## JURISDICTION

2. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 because it is a civil action presenting a federal question and arising under the Fourteenth Amendment to the Constitution of the United States seeking to recover damages for injury resulting from the deprivation of rights under the Civil Rights Act of 1871, 42 U.S.C. § 1983.

## VENUE

3. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 because the events giving rise to the claims occurred at the Cook County Jail ("CCJ"), which is located in the Northern District of Illinois.

## THE PARTIES

4. At all relevant times, Mr. Hunt, Mr. McCorker, Mr. Giles, Mr. Romero, and Mr. Cortez were pretrial detainees, housed in Division 10 of CCJ. CCJ is located in Chicago, Illinois and operated by the Cook County Sheriff's Office (the "Sheriff's Office").

5. Defendant County of Cook ("Cook County") is a local public entity under the laws of the State of Illinois. Cook County, through the Sheriff's Office, runs CCJ and has a legal responsibility to ensure that CCJ is operated in compliance with the United States Constitution.

6. At all relevant times, Defendant Thomas Dart ("Sheriff Dart") was and is employed as the Sheriff of Cook County. In his capacity as Sheriff, Sheriff Dart is responsible for the operation of the Cook County Department of Corrections ("CCDOC") and CCJ, including maintaining the health and safety of the detainees housed in CCJ, including, at all relevant times, Plaintiffs named herein.

7.      At all relevant times, Defendant Thomas Miller ("Superintendant Miller") was employed by Cook County as Superintendant of Division 10 at Cook County Jail.  Division 10 is a maximum security and mental health division housing unit designed to house 768 detainees.  At all relevant times described herein, Division 10 housed approximately 1,200 detainees.  On information and belief, Superintendent Miller was responsible for overseeing the facilities and detainees housed in Division 10, including, at all relevant times, Plaintiffs named herein.  Superintendant Miller was also responsible for denying Plaintiffs' grievances regarding the poor standard of care provided them.

8.      At all relevant times, Defendant Dr. Avery Hart ("Dr. Hart") was employed by Cook County as the Chief Medical Officer, Cermak Health Services of Cook County.  Cook County runs the health services for detainees at CCJ under the name "Cermak Health Services of Cook County" ("Cermak").  On information and belief, Dr. Hart is the medical supervisor ultimately responsible for making final medical decisions at CCJ and also deciding whether detainees, including Plaintiffs, will be treated or instead denied treatment.

9.      At all relevant times, J. Lang, RD, LDN ("J. Lang") was employed in the Central Kitchen of CCJ.  On information and belief, J. Lang works in the Central Kitchen of CCJ either as a CCJ employee or as an employee of Aramark Food Services Corporation (or one of its affiliates), the private company which holds a contract to provide food services to CCJ detainees.  The Central Kitchen is responsible for providing meals, including restricted meals, to detainees housed in Division 10 of CCJ.

3

10.     Sheriff Dart is being sued in his official capacity. Superintendent Miller and Dr. Hart are being sued in their official and individual capacities. J. Lang is being sued in an individual capacity.

## FACTUAL ALLEGATIONS COMMON TO MSSRS. MCCORKER, GILES, ROMERO, AND CORTEZ

### A. An Outbreak Of Acute Gastroenteritis Spreads Through Division 10

11.     During February and March 2009, a wide-spread outbreak of acute gastrointestinal illness infected the detainees housed in Division 10 of CCJ. Over a three-week period, the illness, which the Illinois Department of Public Health ("IDPH") estimated was transmitted person-to-person, caused nearly 100 detainees housed in Division 10 to become sick with nausea, vomiting, diarrhea, and/or abdominal cramping.

12.     The first reported occurrence of the outbreak in Division 10 was recorded on February 18, 2009. By February 26, 2009, twenty-two (22) detainees in Division 10 had contracted the illness, and by March 5, 2009 the number increased to fifty-seven (57). On March 10, 2009, Dr. Hart witnessed two detainees receiving intravenous fluids in CCJ's emergency room . CCJ staff, including Dr. Hart and the CCJ infection team, did not begin investigating the outbreak until March 11, 2009. It was not until March 12, 2009, however, that Dr. Hart took any steps to identify, treat, or contain the outbreak when he notified personnel at IDPH of an "outbreak of acute gastroenteritis." By that time, approximately ninety (90) detainees in Division 10 had been affected.

### B. CCJ Fails To Inform Of The Outbreak And To Prevent The Spread Of Disease

13.     IDPH deployed an epidemiologist to Division 10 to observe the symptoms suffered by the detainees, noting that the illness was consistent with norovirus infection.

4

14. Norovirus is a type of virus that causes acute gastroenteritis, an inflammation of the stomach and intestines, which is often accompanied by severe nausea, vomiting, diarrhea, stomach cramping, fever, chills, headache, muscle ache, and fatigue. Norovirus is highly contagious and can spread rapidly in places like Division 10 of CCJ, where large numbers of people live in close proximity. The virus is serious for those who are unable to replace the fluids lost through vomiting and diarrhea and may necessitate special medical attention, including hospitalization for treatment with intravenous fluids.

15. IDPH prepared a final report on the outbreak (the "IDPH Final Report"), which noted that the following prevention measures were recommended to contain the norovirus:

   a. CCJ staff was instructed to clean the affected tiers with bleach solution at least once per day;
   b. detainees were to be provided with a bar of soap and Clorox hand wipes;
   c. Division 10 inmates were to be placed on "lock-down" (*i.e.*, their movement was to be restricted and they were not to be allowed to use the gym or go to court);
   d. sick inmates were to be isolated or otherwise confined with other sick inmates;
   e. Division 10 officers were to be given alcohol hand gel; and
   f. CCJ kitchen was to be inspected for deficiencies.

Despite IDPH's recommendation that CCJ staff clean the affected tiers with bleach solution at least once per day, CCJ performed this task on only a single instance during the outbreak. And although IDPH recommended that detainees be given a bar of soap and hand wipes, on information and belief, this was never done. CCJ's selective compliance with IDPH's recommendations caused the outbreak to persist longer than it would have had CCJ timely implemented the recommended measures. CCJ's disregard of the recommendations of IDPH

health officials demonstrates a deliberate indifference to the health and safety of the detainees, including Plaintiffs named herein.

16. While on lock-down, Superintendant Miller made a general announcement that a virus was going around the facility and the detainees were "quarantined." On information and belief, Superintendent Miller did not elaborate on the type of virus, its highly communicable nature, the number of persons afflicted, or any additional information concerning the illness. Despite IDPH's finding that the illness was consistent with norovirus infection, CCJ, including Dr. Hart and Superintendent Miller, failed to provide the detainees in Division 10, including Mssrs. McCorker, Giles, Romero, and Cortez, with any guidance as to how to safeguard or prevent against further proliferation of the illness, despite knowledge that the illness was highly communicable and affected a significant portion of the Division 10 population.

17. At or around March 12, 2009, IDPH or CCJ staff collected several stool samples from ailing detainees and submitted them for norovirus testing. Of seven samples initially collected, only three were actually tested. Of those three that were tested, one tested positive for norovirus. Eleven days later, six more stool samples were tested which failed to show the presence of norovirus.

### C. Plaintiffs Become Ill As A Result Of Norovirus Outbreak

18. Mssrs. McCorker, Giles, Romero, and Cortez were among those inmates who became ill during the norovirus outbreak in February and March 2009. Between March 4 and March 13, 2009, these four detainees made several requests for medical attention and collectively submitted seven grievances complaining of symptoms, lack of information about what was happening, and lack of medical treatment.

19. Mr. Giles and Mr. Romero each submitted grievances on March 4, 2009 complaining of similar symptoms, including diarrhea, nausea, upset stomach, vomiting, weakness, and stomach pains. Due to CCJ's withholding of information regarding the norovirus outbreak, both erroneously believed their symptoms were a product of food poisoning caused by the dinner served on March 2, 2009. Neither Mr. Giles nor Mr. Romero was seen by a doctor, nurse, or indeed, any health care practitioner.

20. Mr. Romero submitted a second complaint on March 13, 2009 to report that he was still suffering from stomach pains, diarrhea, vomiting, and lack of sleep. Mr. Romero's second grievance notes that he requested medical attention but was refused.

21. Mr. McCorker filed three grievances during the norovirus outbreak: two on March 7, 2009 and a third on March 13, 2009. In the March 7, 2009 grievances, Mr. McCorker reported that he was suffering from food poisoning and first became ill on March 3, 2009. Mr. McCorker was taken to Cermak on March 7, 2009 where, after being told that he and approximately ten other inmates had food poisoning, he was given one or two pills to take. In his third grievance filed on March 13, 2009, Mr. McCorker reported that he still suffered from diarrhea and "serious bodily dysfunction." Although he witnessed the single instance of others cleaning his cell and changing his clothes, sheets, and blankets, no one had bothered to inform him as to the purpose of these actions or the source of his affliction.

22. Mr. Cortez became ill around the same time as Mssrs. McCorker, Giles, and Romero. In the same manner, Mr. Cortez also experienced diarrhea, stomach pains, cramps, headaches, and nausea. He submitted a grievance on March 13, 2009, complaining that there was some sort of sickness going around but that no one would tell the inmates specifically what

the sickness was. Mr. Cortez was never tested or provided any medical attention during his illness.

### D. Plaintiffs' Requests For Medical Attention Are Summarily Ignored

23. Despite requesting medical care and submitting multiple grievances demanding medical attention, on information and belief, none of these Plaintiffs, except for Mr. McCorker, was ever examined by a health care professional or otherwise received medical attention. In a standardized and delayed response, Superintendent Miller summarily responded to all of these Plaintiffs' grievances, regardless of the grievance date, the symptoms complained of, or whether the individual actually received medical attention.

24. Superintendent Miller's perfunctory response to all grievances stated: "Diagnosed as a contagious virus. Proper medical attention was provided for all detainees with symptoms, and cleared by medical staff within seven days." Although the grievances of Mssrs. McCorker, Giles, Romero, and Cortez were submitted on different dates, Superintendent Miller's response to each of them was dated April 21, 2009, over two months after the first incident of illness was reported in Division 10, and almost six weeks after they first complained of falling ill.

25. Furthermore, Superintendent Miller's response stated that medical attention was provided to all detainees with symptoms, when, in fact, several detainees, including certain of Plaintiffs named herein, never received such medical attention.

### FACTUAL ALLEGATIONS AS TO MR. HUNT
### E. Mr. Hunt Falls Ill While Housed In Division 10

26. Mr. Hunt, in a separate incident, fell severely ill while residing in Division 10. Mr. Hunt's illness began in early December 2008 and included symptoms of excessive vomiting,

8

diarrhea, and stomach cramps that spanned the course of several weeks. At the time, Mr. Hunt did not know the source of his sickness.

27. Throughout the course of December 2008, Mr. Hunt experienced visible symptoms stemming from his illness. On information and belief, during this time CCJ staff observed the manifestation of Mr. Hunt's sickness. On at least one instance, CCJ staff witnessed Mr. Hunt vomit.

28. Due to the suffering and discomfort stemming from his illness, Mr. Hunt filed various requests for medical treatment throughout the month of December 2008. Despite CCJ staff witnessing Mr. Hunt's illness and suffering, his requests for medical treatment were summarily ignored. On information and belief, Mr. Hunt escalated his requests by submitting a "Detainee Grievance Form" regarding his lack of medical treatment at some point in December 2008. This grievance, like Mr. Hunt's various medical requests, was ignored by CCJ staff, and Mr. Hunt never received a response. Notably, no changes were made to Mr. Hunt's diet to compensate for his inability to keep food or liquid in his stomach, nor was the cell that Mr. Hunt shared with another detainee cleaned during this time.

**F. After Weeks Of Suffering, Mr. Hunt Is Seen By Dr. Patel And Prescribed A Special Diet To Alleviate His Illness**

29. After several weeks of suffering, on December 31, 2008, Mr. Hunt was allowed to go to the CCJ Dispensary where he was examined by Dr. Manisha Patel ("Dr. Patel"). By that point, Mr. Hunt had been ill for several days without treatment or other accommodation.

30. Mr. Hunt described for Dr. Patel the various symptoms he had, including the prolonged occurrence of vomiting, diarrhea, and other stomach pains. Dr. Patel ordered that Mr.

Hunt be sent to Cermak Health Services to receive a gastrointestinal x-ray to determine the source of Mr. Hunt's illness.

31. As part of Mr. Hunt's treatment, Dr. Patel ordered that Mr. Hunt receive a special diet low in cholesterol, fat, and salt with the purpose of relieving Mr. Hunt's aggravated stomach pains. On December 31, 2008, Dr. Patel filled out and submitted a Restricted Diet Order Form requesting that Mr. Hunt receive this special diet.

**G. CCJ Staff, Including Defendants, Fail To Provide Mr. Hunt With The Prescribed Diet**

32. Despite the December 31, 2008 Restricted Diet Order from Dr. Patel, CCJ staff, including Defendant J. Lang, disregarded the prescribed diet and failed to provide Mr. Hunt with a diet low in cholesterol, fat, and salt.

33. Throughout January 2009, Mr. Hunt informed CCJ staff, including tier officers and nurses, that he was not receiving the special diet medically prescribed for him. These complaints again fell on deaf ears. Mr. Hunt did not receive even one meal complying with the December 31, 2008 Restricted Diet Order prescribed for him by Dr. Patel, and his requests for implementation were ignored.

**H. Mr. Hunt Is Definitively Diagnosed With Bacterial Infection**

34. At Dr. Patel's order, at or around late January or early February 2009, the CCJ Dispensary Unit performed a blood test on Mr. Hunt to determine the cause of his illness. On February 10, 2009, Dr. Patel met with Mr. Hunt to discuss the results.

35. Dr. Patel informed Mr. Hunt that the test revealed that bacteria was found in his blood. The presence of bacteria in his blood was believed to be the cause of Mr. Hunt's vomiting, diarrhea, and stomach cramping. On February 10, 2009, after nearly two months without treatment or other accommodation, Mr. Hunt was finally prescribed medication to

combat his illness. Dr. Patel prescribed two antibiotics, amoxicillin and biaxin, to help fight the bacteria found in Mr. Hunt's system.

36. At this time, Mr. Hunt explained to Dr. Patel that CCJ was not providing him with the special diet despite Dr. Patel's December 31, 2008 order to do so. During this time, the diet provided to Mr. Hunt continued to exacerbate his stomach problems. As Mr. Hunt had yet to obtain the diet that would help alleviate his illness, Dr. Patel filled out another Restricted Diet Order Form, again requesting that Mr. Hunt receive meals that would not aggravate his stomach.

**I. Defendants Continue To Deny Mr. Hunt The Prescribed Diet To Alleviate His Illness**

37. Throughout February 2009, CCJ continued to deny Mr. Hunt a diet low in cholesterol, fat, and salt, despite two formal orders from Dr. Patel for such a diet. On February 23, 2009, Mr. Hunt filed a grievance seeking to implement Dr. Patel's prescribed special diet ("February 23, 2009 Grievance"). It was not until March 19, 2009 that Defendant J. Lang of the Central Kitchen finally responded in writing to the grievance. J. Lang's response to the failure to implement the diet was that Mr. Hunt was "not on the diet list" and could not be added due to lack of access. Nevertheless, J. Lang indicated Mr. Hunt would be "manually" added to the system. On March 26, 2009, Defendant Superintendent Miller reviewed and signed J. Lang's response to the February 23, 2009 Grievance.

38. It was not until March 30, 2009, however, that Mr. Hunt actually received this written response. That is, J. Lang's response came more than thirty (30) days after Mr. Hunt filed the February 23, 2009 Grievance, almost three months after Dr. Patel's initial request for a restricted diet was prescribed, and close to four months after the onset of Mr. Hunt's sickness.

39. As of March 30, 2009, despite two formally prescribed medical orders and the February 23, 2009 Grievance, Mr. Hunt still had not received the special diet and appealed J.

11

Lang's response. The CCJ Appeal Board accepted Mr. Hunt's request for an appeal, requesting that the "issue be addressed." The Appeal Board's determination, however, was not made until June 9, 2009, more than **six months after** Dr. Patel initially prescribed Mr. Hunt's special diet.

### J. Mr. Hunt Continues To Suffer

40. Mr. Hunt again fell ill in June 2009, experiencing repeated bouts of vomiting, diarrhea, and stomach cramping. Mr. Hunt repeatedly informed CCJ staff of his illness, including notifying the nurses making rounds to dispense medication to other detainees, as well as filing multiple medical request forms. Again, Mr. Hunt's pleas were ignored.

41. On June 20, 2009, Mr. Hunt filed another grievance (the "June 20, 2009 Grievance"), informing CCJ of his sickness and the denial of medical treatment, and imploring CCJ for access to medical care. Another ten days passed before CCJ responded to the June 20, 2009 Grievance, indicating Mr. Hunt would be referred to Patient Care Services and a Division 10 doctor. Defendant Superintendent Miller reviewed the June 20, 2009 Grievance and signed off on the response on July 14, 2009.

42. The response was not provided to Mr. Hunt until July 17, 2009 at which point Mr. Hunt appealed because he was still vomiting and experiencing stomach problems. Nevertheless, the Appeal Board denied the appeal on August 25, 2009, indicating that in the interim, Mr. Hunt had been seen by Cermak.

43. During the time Mr. Hunt's appeal of the June 20, 2009 Grievance response was pending, he filed another grievance seeking relief from his ongoing stomach problems experienced throughout the months of June and July 2009 (the "July 24, 2009 Grievance"). CCJ's response on July 28, 2009 was that Mr. Hunt would be referred to the Division 10

physician and Patient Care Services. As of August 5, 2009, however, Mr. Hunt still had not been treated or received any medication for his illness, and thus filed an appeal.

44. Mr. Hunt's appeal was again denied. Despite the documented presence of bacteria in Mr. Hunt's system, the failure to implement the physician-prescribed diet for Mr. Hunt, and Mr. Hunt's inability to receive medical treatment related to this illness, the Appeal Board denied the appeal. The Appeal Board found that Mr. Hunt now was experiencing side effects to Naparsyn—a drug prescribed for and taken by Mr. Hunt for the past four years during his pre-trial detention at CCJ—and did not require medical attention.

45. It is unknown when, if ever, Mr. Hunt received the diet specifically prescribed for him. As the Restricted Diet Order Forms, February 23, 2009 Grievance, and response, appeal, and appeal response thereto indicate, at a minimum six months passed between when Dr. Patel first prescribed the diet and when Mr. Hunt may have first received it.

**K. Defendants' Conduct Evinces A Pattern Of Deliberate Indifference**

46. Defendants consistently demonstrated collective indifference to the recommendations and prescriptions of health care professionals as to the necessary level of care with respect to Mr. Hunt and Mssrs. McCorker, Giles, Romero, and Cortez.

47. As the above-described incidents illustrate, Defendants repeatedly failed to respond timely to requests for medical treatment and failed to implement the orders of medical personnel. Defendants' conduct also demonstrates they repeatedly turned a blind eye to rampant illness within the jail and withheld important information from detainees, including Plaintiffs, concerning serious and contagious health risks present in their environment.

## CAUSES OF ACTION

### Count I

**(Mssrs. McCorker, Giles, Romero, and Cortez's Section 1983, Fourteenth Amendment Claim Against Dr. Hart and Superintendent Miller In Their Individual Capacities)**

48. Mssrs. McCorker, Giles, Romero, and Cortez reallege and incorporate by reference the allegations contained in Paragraphs 1 through 49.

49. The norovirus outbreak was objectively serious and posed a substantial risk of serious harm to CCJ detainees, including Plaintiffs named herein.

50. Defendants Dr. Hart and Superintendent Miller acted with deliberate indifference to Plaintiffs' health and safety when they failed to timely investigate and contain the norovirus outbreak, which they knew posed a substantial and unreasonable risk of harm to Plaintiffs.

51. Dr. Hart and Superintendent Miller knew of the grievous danger posed to Plaintiffs by the norovirus outbreak and acted with deliberate indifference by denying medical attention, refusing to implement IDPH's recommended prevention measures, withholding information related to the outbreak, and failing to take action to safeguard against its spread.

52. At all relevant times, Dr. Hart and Superintendent Miller acted under the color of the authority of the State of Illinois by virtue of their positions as Chief Medical Officer of Cermak and Superintendent of Division 10 of CCJ, respectively.

53. Defendants' deliberate indifference caused injury to Plaintiffs, including exposure to norovirus infection, prolonged vomiting, diarrhea, stomach cramping, and dizziness and other pain and mental anguish.

**WHEREFORE,** Mssrs. McCorker, Giles, Romero, and Cortez respectfully request the following relief jointly and severally:

    A.    A declaration that Defendants Dr. Hart and Superintendent Miller violated the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of the rights, privileges

and immunities guaranteed to Mssrs. McCorker, Giles, Romero, and Cortez by the Fourteenth Amendment to the United States Constitution;

B.   Compensatory and punitive damages in amounts to be proven at trial arising from Dr. Hart and Superintendent Miller's wrongful conduct;

C.   Costs, expenses, and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

D.   Such other relief as this Court deems necessary and proper.

## Count II

### (Mr. Hunt's Section 1983, Fourteenth Amendment Claim Against J. Lang and Superintendent Miller)

54.   Mr. Hunt realleges and incorporates by reference the allegations contained in Paragraphs 1 through 55.

55.   Mr. Hunt was diagnosed by a physician as having a bacterial infection in his blood, a serious condition that requires medical treatment. Bacterial infection is an objectively serious condition that, if untreated or inadequately treated, can pose a substantial risk of serious danger to a person's health.

56.   As part of Mr. Hunt's treatment for his condition, he was medically prescribed a special diet. Defendants J. Lang and Superintendent Miller knew of Mr. Hunt's condition and the prescribed special diet as part of his treatment.

57.   Defendants disregarded the risk and showed deliberate indifference to Mr. Hunt's serious medical condition and pain by:

(a)   Repeatedly failing to implement a diet medically prescribed for Mr. Hunt for more than six months despite formal orders to do so;

  (b)  Refusing Mr. Hunt's repeated requests and grievances seeking medical treatment with knowledge that he was experiencing symptoms of vomiting, diarrhea, and stomach cramping; and

  (c)  Failing to take action to prevent Mr. Hunt's prolonged pain and discomfort associated with the denials and delays of proper medical treatment, including failure to implement the specialized diet.

58. Defendants J. Lang and Superintendent Miller acted under color of state law by and through the scope of their employment as persons in positions of authority at CCJ.

59. Defendants' deliberate indifference caused Mr. Hunt injury, including prolonged vomiting, diarrhea, and stomach cramping and other pain and mental anguish.

**WHEREFORE,** Mr. Hunt respectfully requests the following relief, jointly and severally:

 A. A declaration that Defendants Superintendent Miller and J. Lang violated the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of the rights, privileges and immunities guaranteed to Mr. Hunt by the Fourteenth Amendment to the United States Constitution;

 B. Compensatory and punitive damages in amounts to be proven at trial arising from Superintendent Miller and J. Lang's wrongful conduct;

 C. Costs, expenses, and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

 D. Such other relief as this Court deems necessary and proper.

## Count III

**(Plaintiffs' Section 1983, Fourteenth Amendment *Monell* Claim Against Cook County and Official Defendants Sheriff Dart, Superintendent Miller, and Dr. Hart)**

60. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 61.

61. Defendants have a wide-spread and well-settled custom or practice of:

    (a) Delaying investigation and mitigation of serious medical conditions suffered by significant portions of the detainee population;

    (b) Failing to timely respond to detainee requests and grievances for medical treatment;

    (c) Ignoring and failing to implement the recommendations and prescriptions of health care professionals; and

    (d) Withholding information related to the communicability of diseases, conditions, bacteria, and viruses and other information essential to the health and safety of the detainees.

62. As a result of the foregoing custom(s) or practice(s) Defendants' failure to act even though the need to act was obvious and the failure to act would likely result in constitutional harm to Plaintiffs by prolonging detainee suffering, exacerbating the illnesses suffered by detainees, and facilitating the excessive spread of communicable disease. Defendants were aware of the risks created but nevertheless, failed to take steps to protect Plaintiffs from serious harm.

63. The foregoing custom(s) or practice(s) are contrary to medical standards and are deliberately indifferent to the health and safety of detainees, including Plaintiffs named herein.

64. Defendants' adherence to said custom(s) and practice(s) caused significant harm to each of the Plaintiffs, as described herein.

**WHEREFORE,** Plaintiffs respectfully request the following relief, jointly and severally:

A. A declaration that Defendant Cook County and Official Defendants Sheriff Dart, Superintendent Miller, and Dr. Hart violated the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of the rights, privileges and immunities guaranteed to Plaintiffs by the Fourteenth Amendment to the United States Constitution;

B. Compensatory damages in an amount to be proven at trial arising from Defendant Cook County and Official Defendants Sheriff Dart, Superintendent Miller, and Dr. Hart's wrongful conduct;

C. Costs, expenses, and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

D. Such other relief as this Court deems necessary and proper.

Date: May 5, 2010

Respectfully submitted,

/s/ Kenneth Schuler
One of the Attorneys for Plaintiffs

Kenneth Schuler
Lyndsay D. Speece
Marissa Downs
Alicia Weis
LATHAM & WATKINS LLP
233 South Wacker Drive Suite 5800
Chicago, Illinois 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

## **CERTIFICATE OF SERVICE**

I, Kenneth Schuler, an attorney, hereby certify that on May 5, 2010, I electronically filed the Plaintiffs' FOURTH AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Michael D. Jacobs**
mjacobs@cookcountygov.com

- **Maureen O'Donoghue Hannon**
mhannon@cookcountygov.com

/s/ Kenneth G. Schuler
Kenneth G. Schuler
of LATHAM & WATKINS LLP