**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LEE McCORKER,** | ) | |
| **TAVARES HUNT,** | ) | |
| **BRUCE GILES,** | ) | |
| **JOSE H. ROMERO, and** | ) | |
| **GEORGE CORTEZ,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 09-C-2071** |
| | ) | |
| **v.** | ) | **Judge Matthew F. Kennelly** |
| | ) | |
| **THOMAS DART, in his Official Capacity as** | ) | |
| **Sheriff of Cook County, COUNTY OF** | ) | |
| **COOK, ILLINOIS, a local public entity under** | ) | |
| **the laws of the State of Illinois, MICHAEL** | ) | |
| **MILLER, Superintendant of Division 10 at** | ) | |
| **Cook County Jail, AVERY HART, Medical** | ) | |
| **Director of Cook County Jail, JACLYN** | ) | |
| **LANG, former dietician at the Cook County** | ) | |
| **Jail, and UNIDENTIFIED WARD CLERK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>FIFTH AMENDED COMPLAINT</u>

Plaintiffs, TAVARES HUNT ("Mr. Hunt"), LEE McCORKER ("Mr. McCorker"),

BRUCE GILES ("Mr. Giles"), JOSE H. ROMERO ("Mr. Romero"), and GEORGE CORTEZ

("Mr. Cortez") by and through their appointed counsel, LATHAM & WATKINS LLP, for their

Fifth Amended Complaint ("Complaint") hereby state as follows:

## <u>NATURE OF THE ACTION</u>

1.     This is a civil action brought under the Civil Rights Act of 1871, 42 U.S.C. §

1983, based on violations of the Fourteenth Amendment to the Constitution of the United States.

This action arises from the suffering Plaintiffs endured as a result of Defendants' deliberate

indifference to their health and safety.

## JURISDICTION

2.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 because it is a civil action presenting a federal question and arising under the Fourteenth Amendment to the Constitution of the United States seeking to recover damages for injury resulting from the deprivation of rights under the Civil Rights Act of 1871, 42 U.S.C. § 1983.

## VENUE

3.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 because the events giving rise to the claims occurred at the Cook County Jail ("CCJ"), which is located in the Northern District of Illinois.

## THE PARTIES

4.      At all relevant times, Mr. Hunt, Mr. McCorker, Mr. Giles, Mr. Romero, and Mr. Cortez were pretrial detainees, housed in Division 10 of CCJ.  CCJ is located in Chicago, Illinois and operated by the Cook County Sheriff's Office (the "Sheriff's Office").

5.      Defendant County of Cook ("Cook County") is a local public entity under the laws of the State of Illinois.  Cook County, through the Sheriff's Office, runs CCJ and has a legal responsibility to ensure that CCJ is operated in compliance with the United States Constitution.

6.      At all relevant times, Defendant Thomas Dart ("Sheriff Dart") was and is employed as the Sheriff of Cook County.  In his capacity as Sheriff, Sheriff Dart is responsible for the operation of  the Cook County Department of Corrections ("CCDOC") and CCJ, including maintaining the health and safety of the detainees housed in CCJ, including, at all relevant times, Plaintiffs named herein.

7.      At all relevant times, Defendant Thomas Miller ("Superintendant Miller") was employed by Cook County as Superintendant of Division 10 at Cook County Jail. Division 10 is a maximum security and mental health division housing unit designed to house 768 detainees. At all relevant times described herein, Division 10 housed approximately 1,200 detainees. On information and belief, Superintendent Miller was responsible for overseeing the facilities and detainees housed in Division 10, including, at all relevant times, Plaintiffs named herein. Superintendant Miller was also responsible for denying Plaintiffs' grievances regarding the poor standard of care provided them.

8.      At all relevant times, Defendant Dr. Avery Hart ("Dr. Hart") was employed by Cook County as the Chief Medical Officer, Cermak Health Services of Cook County. Cook County runs the health services for detainees at CCJ under the name "Cermak Health Services of Cook County" ("Cermak"). On information and belief, Dr. Hart is the medical supervisor ultimately responsible for making final medical decisions at CCJ and also deciding whether detainees, including Plaintiffs, will be treated or instead denied treatment.

9.      At all relevant times, Jaclyn Lang, RD, LDN ("Ms. Lang") was employed in the Central Kitchen of CCJ. On information and belief, Ms. Lang worked in the Central Kitchen of CCJ as an employee of Aramark Correctional Services, LLC, the private company which holds a contract to provide food services to CCJ detainees. The Central Kitchen is responsible for providing meals, including restricted meals, to detainees housed in Division 10 of CCJ.

10.     Upon information and belief, the Unidentified Ward Clerk, also known as an administrative aide, ("Unidentified Ward Clerk") was employed to work in Division 10 by either CCDOC or Cermak and worked in that capacity from December 31, 2008 through February 10, 2009. During that time period, upon information and belief, the Ward Clerk was responsible for

entering into the "CIMIS Computer System Medical screen" three separate restrictive diet order forms on behalf of Mr. Hunt but either completely failed to do so or failed to do so properly to ensure that Mr. Hunt was added to the official daily diet report and timely provided with his medical diet.

11.     Sheriff Dart is being sued in his official capacity. Superintendent Miller and Dr. Hart are being sued in their official and individual capacities. Ms. Lang and Unidentified Ward Clerk are being sued in their individual capacities.

## FACTUAL ALLEGATIONS

## I.     FACTUAL ALLEGATIONS COMMON TO MSSRS. McCORKER, GILES, ROMERO, AND CORTEZ

### A.     An Outbreak Of Acute Gastroenteritis Spreads Through Division 10.

12.     During February and March 2009, a wide-spread outbreak of acute gastrointestinal illness infected the detainees housed in Division 10 of CCJ. Over a three-week period, the illness, which the Illinois Department of Public Health ("IDPH") estimated was transmitted person-to-person, caused nearly 100 detainees housed in Division 10 to become sick with nausea, vomiting, diarrhea, and/or abdominal cramping.

13.     The first reported occurrence of the outbreak in Division 10 was recorded on February 18, 2009. By February 26, 2009, twenty-two (22) detainees in Division 10 had contracted the illness, and by March 5, 2009 the number increased to fifty-seven (57). On March 10, 2009, Dr. Hart witnessed two detainees receiving intravenous fluids in CCJ's emergency room . CCJ staff, including Dr. Hart and the CCJ infection team, did not begin investigating the outbreak until March 11, 2009. Dr. Hart notified the IDPH of the outbreak on March 12, 2009. By that time, approximately ninety (90) detainees in Division 10 had been affected.

**B.      CCJ Fails To Inform Of The Outbreak And To Prevent The Spread Of Disease.**

14.      Upon information and belief, IDPH deployed an epidemiologist to Division 10 to observe the symptoms suffered by the detainees, noting that the illness was consistent with norovirus infection.

15.      Norovirus is a type of virus that causes acute gastroenteritis, an inflammation of the stomach and intestines, which is often accompanied by severe nausea, vomiting, diarrhea, stomach cramping, fever, chills, headache, muscle ache, and fatigue.  Norovirus is highly contagious and can spread rapidly in places like Division 10 of CCJ, where large numbers of people live in close proximity.  The virus is serious for those who are unable to replace the fluids lost through vomiting and diarrhea and may necessitate special medical attention, including hospitalization for treatment with intravenous fluids.

16.      At or around March 12, 2009, IDPH or CCJ staff collected several stool samples from ailing detainees and submitted them for norovirus testing.  Of seven samples initially collected, only three were actually tested.  Of those three that were tested, one tested positive for norovirus, subtype G2.  No additional stool samples were tested until eleven days later – after the spread of the virus had failed to be contained.

17.      On or after March 13, 2009, Superintendant Miller and Dr. Hart made a general announcement to the detainees who were present in the dayrooms of two of the affected tiers in Division 10.  Superintendant Miller and Dr. Hart informed those in attendance that a virus was going around the facility and the detainees on those tiers were being "quarantined."  On information and belief, neither Superintendant Miller nor Dr. Hart elaborated on the type of virus, the number of persons afflicted, or any additional information concerning the illness.  On

information and belief, they never attempted to inform those individuals already bedridden in their cells of what was going on.

18.     Upon information and belief, IDPH or one of the local public health agencies prepared a final report on the outbreak (the "Final Report"), which noted that the following measures were taken to contain the norovirus:

     a.     CCJ staff was instructed to clean the affected tiers with bleach solution at least once per day;

     b.     detainees were to be provided with a bar of soap and Clorox hand wipes;

     c.     Division 10 inmates were to be placed on "lock-down" (*i.e.*, their movement was to be restricted and they were not to be allowed to use the gym or go to court);

     d.     sick inmates were to be isolated or otherwise confined with other sick inmates;

     e.     Division 10 officers were to be given alcohol hand gel; and

     f.     CCJ kitchen was to be inspected for deficiencies.

19.     Despite the recommendation that CCJ staff clean the affected tiers with bleach solution at least once per day, CCJ staff performed such a cleaning on only a single occasion during the outbreak.  And although the Final Report stated that detainees were given hand wipes, on information and belief, this was never done.   CCJ's selective compliance with these prevention measures demonstrates a deliberate indifference to the health and safety of the detainees, including Plaintiffs named herein.

20.     The sanitation and hygiene policies in place prior to and subsequent to the norovirus outbreak also demonstrate deliberate indifference to inmate health and safety and directly facilitated the spread of the norovirus throughout CCJ.  Prior to the cleaning measures taken in response to the norovirus, for example, it is unknown when, if ever, CCJ personnel had cleaned the cells (or any of the fixtures therein) within Division 10.

21. Per official CCDOC policy as of the time of the outbreak, detainees were individually responsible for the cleanliness and sanitation of their cells. However, in blatant disregard to the health risks created by such indifference, the responsible Defendants utterly failed to provide adequate means to the detainees to ensure such basic sanitary conditions. Thus, the defendants failed to provide the Plaintiffs with any disinfectant, bleach, or any other cleaning supplies with which to ensure that their immediate living areas could be maintained in a clean and sanitary condition. Indeed, one or more of the Plaintiffs have resorted to cleaning their toilets and cells with their weekly rations of toothpaste or bar soap, which, even when used only for their intended purposes, are exhausted within a few days of distribution.

22. Further, and also in blatant disregard to the health risks created by such indifference, the responsible Defendants utterly failed to provide adequately clean sheets and detainee uniforms during all times pertinent hereto. Plaintiffs also have to rely on independent cleaning measures for their sheets and uniforms, which are changed out infrequently and are oftentimes dirty when initially supplied to the inmates.

**C.     Plaintiffs Become Ill As A Result Of Norovirus Outbreak.**

23. Mssrs. McCorker, Giles, Romero, and Cortez were among those inmates who became ill during the norovirus outbreak in February and March 2009. Between March 4 and March 13, 2009, these four detainees made several requests for medical attention and collectively submitted seven grievances complaining of symptoms, lack of information about what was happening, and lack of medical treatment.

24. Mr. Giles and Mr. Romero each submitted grievances on March 4, 2009 complaining of similar symptoms, including diarrhea, nausea, upset stomach, vomiting, weakness, and stomach pains. Due to CCJ's withholding of information regarding the norovirus

25.     Mr. Romero submitted a second complaint on March 13, 2009 to report that he was still suffering from stomach pains, diarrhea, vomiting, and lack of sleep.  Mr. Romero's second grievance notes that he requested medical attention but was refused.

26.     Mr. McCorker filed three grievances during the norovirus outbreak: two on March 7, 2009 and a third on March 13, 2009.  In the March 7, 2009 grievances, Mr. McCorker reported that he was suffering from food poisoning and first became ill on March 3, 2009.  Mr. McCorker was taken to Cermak on March 7, 2009 where, after being told that he and approximately ten other inmates had food poisoning, he was given one or two pills to take.  In his third grievance filed on March 13, 2009, Mr. McCorker reported that he still suffered from diarrhea and "serious bodily dysfunction."  Although he witnessed the single instance of others cleaning his cell and changing his clothes, sheets, and blankets, no one had bothered to inform him as to the purpose of these actions or the source of his affliction.

27.     Mr. Cortez became ill around the same time as Mssrs. McCorker, Giles, and Romero.  In the same manner, Mr. Cortez also experienced diarrhea, stomach pains, cramps, headaches, and nausea.  He submitted a grievance on March 13, 2009, complaining that there was some sort of sickness going around but that no one would tell the inmates specifically what the sickness was.  Mr. Cortez was never tested or provided any medical attention during his illness.

**D.     Plaintiffs' Requests For Medical Attention Are Summarily Ignored.**

28.     Upon information and belief, CCDOC had in effect at the time a policy requiring that all inmates suspected of having contracted a communicable disease be examined medically.

29.     Despite requesting medical care and submitting multiple grievances demanding medical attention, on information and belief, none of these Plaintiffs, except for Mr. McCorker, was ever examined by a health care professional or otherwise received medical attention.

30.     Upon information and belief, medical request forms were not made available to inmates residing on the tiers hit hardest by the norovirus during the outbreak and all healthcare-related grievances submitted during the norovirus outbreak were forwarded not to healthcare providers at Cermak, but to Superintendant Miller to dispose of in a uniform and cursory manner.

31.     In a standardized and delayed response, Superintendent Miller summarily responded to all of these Plaintiffs' grievances, regardless of the grievance date, the symptoms complained of, or whether the individual actually received medical attention.

32.     Superintendent Miller's perfunctory response to all grievances stated: "Diagnosed as a contagious virus. Proper medical attention was provided for all detainees with symptoms, and cleared by medical staff within seven days."  Although the grievances of Mssrs. McCorker, Giles, Romero, and Cortez were submitted on different dates, Superintendent Miller's response to each of them was dated April 21, 2009, over two months after the first incident of illness was reported in Division 10, and almost six weeks after they first complained of falling ill.

33.     Furthermore, Superintendent Miller's response stated that medical attention was provided to all detainees with symptoms, when, in fact, several detainees, including certain of Plaintiffs named herein, never received such medical attention.

## II.    FACTUAL ALLEGATIONS AS TO MR. HUNT

### A.    Mr. Hunt Falls Ill While Housed In Division 10.

34.    Mr. Hunt, in a separate incident, fell severely ill while residing in Division 10. Mr. Hunt's illness began in early December 2008 and included symptoms of excessive vomiting, diarrhea, and stomach cramps that spanned the course of several weeks.  At the time, Mr. Hunt did not know the source of his sickness.

35.    Throughout the course of December 2008, Mr. Hunt experienced visible symptoms stemming from his illness.  On information and belief, during this time CCJ staff observed the manifestation of Mr. Hunt's sickness.  On at least one instance, CCJ staff witnessed Mr. Hunt vomit.

36.    Due to the suffering and discomfort stemming from his illness, Mr. Hunt filed various requests for medical treatment throughout the month of December 2008.  Despite CCJ staff witnessing Mr. Hunt's illness and suffering, his requests for medical treatment were summarily ignored.  On information and belief, Mr. Hunt escalated his requests by submitting a "Detainee Grievance Form" regarding his lack of medical treatment at some point in December 2008.  This grievance, like Mr. Hunt's various medical requests, was ignored by CCJ staff, and Mr. Hunt never received a response.  Notably, no changes were made to Mr. Hunt's diet to compensate for his inability to keep food or liquid in his stomach, nor was the cell that Mr. Hunt shared with another detainee cleaned during this time.

### B.    After Weeks Of Suffering, Mr. Hunt Is Seen By Dr. Patel And Prescribed A Special Diet To Alleviate His Illness.

37.    After several weeks of suffering, on December 31, 2008, Mr. Hunt was allowed to go to the CCJ Dispensary where he was examined by Dr. Manisha Patel ("Dr. Patel").  By that point, Mr. Hunt had been ill for several days without treatment or other accommodation.

38.     Mr. Hunt described for Dr. Patel the various symptoms he had, including the prolonged occurrence of vomiting, diarrhea, and other stomach pains. Dr. Patel ordered that Mr. Hunt be sent to Cermak Health Services to receive a gastrointestinal x-ray to determine the source of Mr. Hunt's illness.

39.     As part of Mr. Hunt's treatment, Dr. Patel ordered that Mr. Hunt receive a special diet low in cholesterol, fat, and salt with the purpose of relieving Mr. Hunt's aggravated stomach pains. On December 31, 2008, Dr. Patel filled out and submitted a Restricted Diet Order Form requesting that Mr. Hunt receive this special diet.

**C.     CCJ Staff, Including Defendants, Fail To Take Steps To Ensure Mr. Hunt Is Provided His Prescribed Diet.**

40.     Per Cermak policy, once Dr. Patel ordered the medical or restrictive diet on Mr. Hunt's behalf, Unidentified Ward Clerk was required to enter the diet order into the "CIMIS Computer System Medical screen." The CIMIS computer system would then provide the "Correctional Food Service Management" with an official daily diet report listing all of the detainees on special diets and what diets they are to receive. The diet repot would then be forwarded to Ms. Lang and the Central Kitchen which was responsible for preparing the meals as directed. Cermak is also required to fax a copy of the diet directly to the Central Kitchen and, upon information and belief, to Ms. Lang at (773) 523-2565.

41.     The process broke down at one of the critical junctures in the aforementioned stages with respect to the medical diet prescription issued on December 31, 2008 as Mr. Hunt was not provided with the diet that Dr. Patel had ordered.

42.     Throughout the first two weeks of January 2009, Mr. Hunt informed CCJ staff, including tier officers and nurses, that he was not receiving the special diet medically prescribed for him. These complaints largely fell on deaf ears.

43.     On January 13, 2009, Mr. Hunt was again seen by Dr. Patel, informing her that he was still not receiving the medical diet she had prescribed. Dr. Patel issued a second Restricted Diet Order Form for Mr. Hunt that same day. Mr. Hunt received his prescribed diet for approximately one week in response to the second form submitted on his behalf. After this one week, however, Mr. Hunt was again denied the restricted diet meal beginning January 29, 2009.

### D.     Mr. Hunt Is Definitively Diagnosed With Bacterial Infection.

44.     In early February 2009, at Dr. Patel's order, a blood test was performed on Mr. Hunt to determine the cause of his illness. Dr. Patel met with Mr. Hunt on February 10, 2009 to discuss the results.

45.     Dr. Patel informed Mr. Hunt at that time that the test revealed that he had tested positive for the "h pylori" bacteria, which she in turn believed to be the cause of Mr. Hunt's vomiting, diarrhea, and stomach cramping. On February 10, 2009, after nearly two months without treatment or other accommodation, Mr. Hunt was finally prescribed medication to combat his illness. Dr. Patel prescribed amoxicillin, biaxin, and prilosec to help fight the bacteria found in Mr. Hunt's system.

46.     At this time, Mr. Hunt again explained to Dr. Patel that he was not being provided his restrictive diet despite the two orders Dr. Patel previously submitted on December 31, 2008 and January 21, 2009. During this time, the diet provided to Mr. Hunt continued to exacerbate his stomach problems. As Mr. Hunt had yet consistently to obtain the diet that would help alleviate his illness, Dr. Patel filled out another Restricted Diet Order Form on February 10, 2009 again requesting that Mr. Hunt receive meals that would not aggravate his stomach.

### E.     Defendants Continue To Deny Mr. Hunt The Prescribed Diet To Alleviate His Illness.

47.     Throughout February 2009, CCJ continued to deny Mr. Hunt a diet low in cholesterol, fat, and salt, despite three formal orders from Dr. Patel for such a diet. On February 23, 2009, Mr. Hunt filed a grievance seeking to implement Dr. Patel's prescribed special diet ("February 23, 2009 Grievance"). It was not until March 19, 2009 that Defendant Ms. Lang of the Central Kitchen finally responded in writing to the grievance. Ms. Lang's response to the failure to implement the diet was that Mr. Hunt was "not on the diet list" and could not be added due to lack of access. Nevertheless, Ms. Lang indicated Mr. Hunt would be "manually" added to the system. On March 26, 2009, Defendant Superintendent Miller reviewed and signed Ms. Lang's response to the February 23, 2009 Grievance.

48.     It was not until March 30, 2009, however, that Mr. Hunt actually received this written response. That is, Ms. Lang's response came more than thirty (30) days after Mr. Hunt filed the February 23, 2009 Grievance, almost three months after Dr. Patel's initial request for a restricted diet was prescribed, and close to four months after the onset of Mr. Hunt's sickness.

49.     As of March 30, 2009, despite three formally prescribed medical orders and the February 23, 2009 Grievance, Mr. Hunt still had not received the special diet and appealed Ms. Lang's response. The CCJ Appeal Board accepted Mr. Hunt's request for an appeal, requesting that the "issue be addressed." The Appeal Board's determination, however, was not made until June 9, 2009, more than *six months after* Dr. Patel initially prescribed Mr. Hunt's special diet.

**F.     Mr. Hunt Continues To Suffer.**

50.     Mr. Hunt again fell ill in June 2009, experiencing repeated bouts of vomiting, diarrhea, and stomach cramping. Mr. Hunt repeatedly informed CCJ staff of his illness, including notifying the nurses making rounds to dispense medication to other detainees, as well as filing multiple medical request forms. Again, Mr. Hunt's pleas were ignored.

51.     On June 20, 2009, Mr. Hunt filed another grievance (the "June 20, 2009 Grievance"), informing CCJ of his sickness and the denial of medical treatment, and imploring CCJ for access to medical care. Another ten days passed before CCJ responded to the June 20, 2009 Grievance, indicating Mr. Hunt would be referred to Patient Care Services and a Division 10 doctor. Defendant Superintendent Miller reviewed the June 20, 2009 Grievance and signed off on the response on July 14, 2009.

52.     The response was not provided to Mr. Hunt until July 17, 2009 at which point Mr. Hunt appealed because he was still vomiting and experiencing stomach problems. Nevertheless, the Appeal Board denied the appeal on August 25, 2009, indicating that in the interim, Mr. Hunt had been seen by Cermak.

53.     During the time Mr. Hunt's appeal of the June 20, 2009 Grievance response was pending, he filed another grievance seeking relief from his ongoing stomach problems experienced throughout the months of June and July 2009 (the "July 24, 2009 Grievance"). CCJ's response on July 28, 2009 was that Mr. Hunt would be referred to the Division 10 physician and Patient Care Services.

54.     Mr. Hunt filed an appeal on August 5, 2009. Despite the documented presence of bacteria in Mr. Hunt's system, the failure to implement the physician-prescribed diet for Mr. Hunt, and Mr. Hunt's inability to receive medical treatment related to this illness, the Appeal Board denied the appeal. The Appeal Board found that Mr. Hunt now was experiencing side effects to Naparsyn — a drug prescribed for and taken by Mr. Hunt for the past four years during his pre-trial detention at CCJ — and did not require medical attention.

55.     During all this time, Mr. Hunt continued to implore nurses and guards he encountered to assist him with ensuring that the diet prescribed to him on three separate

occasions was implemented. At least one of the individuals consulted by Mr. Hunt attempted to assist him by directly faxing a copy of the diet order form to the Central Kitchen, and upon information and belief, to Ms. Lang. One such form was faxed as late as July 9, 2009.

56. Upon information and belief, Mr. Hunt was not consistently provided the medical diet until July 2009, approximately *six months after* it was initially prescribed. Once he began receiving this diet on a regular basis, however, his symptoms of gastrointestinal distress were alleviated and he noticed an improvement in his overall condition.

**G. Defendants' Conduct Evinces A Pattern Of Deliberate Indifference.**

57. Defendants consistently demonstrated collective indifference to the recommendations and prescriptions of health care professionals as to the necessary level of care with respect to Mr. Hunt and Mssrs. McCorker, Giles, Romero, and Cortez.

58. As the above-described incidents illustrate, Defendants repeatedly failed to respond timely to requests for medical treatment and failed to implement the orders of medical personnel. Defendants' conduct also demonstrates they repeatedly turned a blind eye to rampant illness within the jail and failed to take necessary measures to ensure detainees, including Plaintiffs, were aware of serious and contagious health risks present in their environment.

## CAUSES OF ACTION

### Count I

**(Mssrs. McCorker, Giles, Romero, and Cortez's Section 1983, Fourteenth Amendment Claim Against Dr. Hart and Superintendent Miller In Their Individual Capacities)**

59.     Mssrs. McCorker, Giles, Romero, and Cortez reallege and incorporate by reference the allegations contained in Paragraphs 1 through 58.

60.     The norovirus outbreak was objectively serious and posed a substantial risk of serious harm to CCJ detainees, including Plaintiffs named herein.

61.     Defendants Dr. Hart and Superintendent Miller acted with deliberate indifference to Plaintiffs' health and safety when they failed to adopt appropriate sanitation and hygiene policies to prevent communicable disease and illness from spreading and failed to timely investigate and contain the norovirus outbreak, which they knew posed a substantial and unreasonable risk of harm to Plaintiffs.

62.     Dr. Hart and Superintendent Miller knew of the grievous danger posed to Plaintiffs by the norovirus outbreak and acted with deliberate indifference by denying medical attention, refusing to implement IDPH's recommended prevention measures, withholding information related to the outbreak, and failing to take action to safeguard against its spread.

63.     At all relevant times, Dr. Hart and Superintendent Miller acted under the color of the authority of the State of Illinois by virtue of their positions as Chief Medical Officer of Cermak and Superintendent of Division 10 of CCJ, respectively.

64.     Defendants' deliberate indifference caused injury to Plaintiffs, including exposure to norovirus infection, prolonged vomiting, diarrhea, stomach cramping, and dizziness and other pain and mental anguish.

**WHEREFORE,** Mssrs. McCorker, Giles, Romero, and Cortez respectfully request the

following relief jointly and severally:

A.    A declaration that Defendants Dr. Hart and Superintendent Miller violated the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of the rights, privileges and immunities guaranteed to Mssrs. McCorker, Giles, Romero, and Cortez by the Fourteenth Amendment to the United States Constitution;

B.    Compensatory and punitive damages in amounts to be proven at trial arising from Dr. Hart and Superintendent Miller's wrongful conduct;

C.    Costs, expenses, and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

D.    Such other relief as this Court deems necessary and proper.

## Count II

### (Mr. Hunt's Section 1983, Fourteenth Amendment Claim Against Ms. Lang, Superintendent Miller, and Unidentified Ward Clerk)

65.    Mr. Hunt realleges and incorporates by reference the allegations contained in Paragraphs 1 through 58.

66.    Mr. Hunt was diagnosed by a physician as having h pylori, a serious condition that requires medical treatment. Bacterial infection is an objectively serious condition that, if untreated or inadequately treated, can pose a substantial risk of serious danger to a person's health.

67.    As part of Mr. Hunt's treatment for his condition, he was medically prescribed a special diet. Defendants Ms. Lang, Superintendent Miller, and Unidentified Ward Clerk knew of Mr. Hunt's condition and the prescribed special diet as part of his treatment.

68.    Defendants disregarded the risk and showed deliberate indifference to Mr. Hunt's serious medical condition and pain by:

(a)    Repeatedly failing to implement a diet medically prescribed for Mr. Hunt for more than six months despite formal orders to do so;

(b)    Refusing Mr. Hunt's repeated requests and grievances seeking medical

treatment with knowledge that he was experiencing symptoms of vomiting, diarrhea, and stomach cramping; and

(c)     Failing to take action to prevent Mr. Hunt's prolonged pain and discomfort associated with the denials and delays of proper medical treatment, including failure to implement the specialized diet.

69.     Defendants Ms. Lang, Superintendent Miller, and Unidentified Ward Clerk acted under color of state law by and through the scope of their employment as persons in positions of authority at CCJ.

70.     Defendants' deliberate indifference caused Mr. Hunt injury, including prolonged vomiting, diarrhea, and stomach cramping and other pain and mental anguish.

**WHEREFORE,** Mr. Hunt respectfully requests the following relief, jointly and severally:

A.     A declaration that Defendants Superintendent Miller and Ms. Lang violated the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of the rights, privileges and immunities guaranteed to Mr. Hunt by the Fourteenth Amendment to the United States Constitution;

B.     Compensatory and punitive damages in amounts to be proven at trial arising from Superintendent Miller and Ms. Lang's wrongful conduct;

C.     Costs, expenses, and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

D.     Such other relief as this Court deems necessary and proper.

## Count III

**(Plaintiffs' Section 1983, Fourteenth Amendment *Monell* Claim Against Cook County and Official Defendants Sheriff Dart, Superintendent Miller, and Dr. Hart)**

71.     Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 58.

72.     Defendants have a wide-spread and well-settled custom or practice of:

(a)     Relying on inadequate and substandard sanitation and hygiene policies

that directly enable and facilitate the spread of communicable disease and illness;

        (b)    Delaying investigation and mitigation of serious medical conditions suffered by significant portions of the detainee population;

        (c)    Failing to timely respond to detainee requests and grievances for medical treatment;

        (d)    Ignoring and failing to implement the recommendations and prescriptions of health care professionals; and

        (e)    Failing to take necessary measures to ensure detainees, including Plaintiffs, were made aware of information related to the communicability of diseases, conditions, bacteria, and viruses and other information essential to their health and safety.

73.    As a result of the foregoing custom(s) or practice(s), Defendants' failed to act even though the need to act was obvious and the failure to act would likely result in constitutional harm to Plaintiffs by prolonging detainee suffering, exacerbating the illnesses suffered by detainees, and facilitating the excessive spread of communicable disease. Defendants were aware of the risks created but nevertheless, failed to take steps to protect Plaintiffs from serious harm.

74.    The foregoing custom(s) or practice(s) are contrary to medical standards and are deliberately indifferent to the health and safety of detainees, including Plaintiffs named herein.

75.    Defendants' adherence to said custom(s) and practice(s) caused significant harm to each of the Plaintiffs, as described herein.

**WHEREFORE,** Plaintiffs respectfully request the following relief, jointly and severally:

    A.    A declaration that Defendant Cook County and Official Defendants Sheriff Dart, Superintendent Miller, and Dr. Hart violated the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of the rights, privileges and immunities guaranteed to Plaintiffs by the Fourteenth Amendment to the United States Constitution;

B.    Compensatory damages in an amount to be proven at trial arising from Defendant Cook County and Official Defendants Sheriff Dart, Superintendent Miller, and Dr. Hart's wrongful conduct;

C.    Costs, expenses, and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

D.    Such other relief as this Court deems necessary and proper.


Date:  November 30, 2010               Respectfully submitted,

                                    /s/ Kenneth Schuler
                                    One of the Attorneys for Plaintiffs

Kenneth Schuler
Lyndsay D. Speece
Marissa L. Downs
Alicia C. Weis
LATHAM & WATKINS LLP
233 South Wacker Drive Suite 5800
Chicago, Illinois 60606
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

## CERTIFICATE OF SERVICE

I, Marissa L. Downs, an attorney, hereby certify that on November 30, 2010, I electronically filed the Plaintiffs' FIFTH AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Michael D. Jacobs**
  mjacobs@cookcountygov.com

- **Maureen O'Donoghue Hannon**
  mhannon@cookcountygov.com

- **Ruth E. Goldwater McCoy**
  rmccoy@lbbslaw.com

/s/ Marissa L. Downs
Marissa L. Downs
of LATHAM & WATKINS LLP